**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JANE DOE,** | : | |
| | : | **Case No. 15-CV-2861** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **DIRECTIONS FOR YOUTH AND** | : | |
| **FAMILIES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## OPINION & ORDER

Before the Court is the Motion for Summary Judgment filed by Defendant Directions for

Youth and Families, Inc. ("DYF") (Doc. 20). It is fully briefed and ripe for review. For the

reasons that follow, the Court **DENIES** the motion.

## I. BACKGROUND

### A. Factual Background

Plaintiff Jane Doe, proceeding pseudonymously because this case concerns confidential

and sensitive medical information, was employed by DYF as an Outreach Counselor from

January 6, 2014 through August 25, 2014. (Am. Compl., Doc. 5, ¶¶ 1, 5.) She is 31 years old,

and has attained a Bachelor's Degree, with Honors, a Master's Degree in Clinical Social Work

from The Ohio State University's College of Social Work, and has completed coursework there

for her PhD in social work, specializing in children and adolescent mental health. (*Id.*, ¶ 5.) She

had successfully held clinical and research positions involving mental health for nine years prior

to her employment at DYF. (*Id.*)

DYF is incorporated in Ohio as a non-profit that provides behavioral and mental health

services to families and children in central Ohio, specializing in drug/alcohol abuse treatment,

teen pregnancy prevention, and diversity and anger management training for at-risk families and children. (*Id.*, ¶ 6.)

At 16 years of age, Doe was diagnosed with Bipolar I Disorder ("bipolar"), a mood disorder whose episodes can substantially impair cognitive and behavioral function. (*Id.*, ¶ 11.) She manages her bipolar using psychotherapy along with medication prescribed by a psychiatrist, and has thus far successfully managed the disorder such that episodes occur less than once per year, on average. (Am. Compl., Doc. 5, ¶ 8; Doe Depo., Doc. 21-4 at 42-43, 51-53.) Relevant here are Doe's bipolar hypomanic episodes, whose symptoms include increased talkativeness, rapid thoughts and speech, and reduced need for sleep. (Am. Compl., Doc. 5, ¶ 11.) When she does suffer an episode, she minimizes its impact via psychiatric treatment and regular mood monitoring including, e.g., keeping a sleep chart and notifying her psychiatrist if she gets fewer than six hours of sleep in a night. (Am. Compl. Doc. 5, ¶ 9; Doe Depo., Doc. 21-4 at 53-54.) Given her diligence, the symptoms of her bipolar are drastically less severe than those of sufferers not receiving psychiatric care. (Am. Compl., Doc. 5, ¶ 11.)

In February of 2014, about one month into her tenure at DYF, Doe disclosed her bipolar to her supervisor, Frances Deutschle, and she asked Deutschle to watch for symptoms of hypomania. (*Id.*, ¶ 13; Doe Depo., Doc. 21-4 at 84.) Based on her knowledge of Doe's experience, skills, temperament, and competency, Deutschle responded that she was not concerned that Doe would have an uncontrollable episode. (Am. Compl., Doc. 5, ¶ 16.) Deutschle even predicted that having the disorder would help Doe better empathize with clients and gain their rapport. (Doe Depo., Doc. 21-4 at 83.)

According to Doe, Deutschle's understanding and support were short-lived. The two held weekly meetings that included discussions about Plaintiff's job performance along with her

mood and self-care. (*Id.* at 85, 90-91.) At their July 3, 2014 meeting, they discussed Doe's physical and psychoaffective health. (Deutschle Depo., 7/3/2014 Individual Supervision, Ex. E, Doc. 32-1 at 26.) Notes from that meeting indicate that Doe's "[p]roductivity ha[d] remained good." (*Id.*) Nonetheless, and based on nothing apparent from the notes, Deutschle wondered whether the demands and stresses of the job had destabilized Doe's mood. (*Id.*) Doe responded that she was not experiencing any symptoms of her bipolar condition, but was suffering from a physical ailment instead—possibly migraines. (Doe Depo., Doc. 21-4 at 120.) Notwithstanding objective evidence of Plaintiff's satisfactory productivity, and based on nothing apparent from the notes of the meeting, Deutschle suggested that a different job might be a better fit for Doe. (Doc. 32-1 at 26.) Concerned, Deutschle called "several" of Doe's clients over the next week, all of whom indicated that they were "unaffected" by Doe's issues. (7/10/2014 Individual supervision, *Id.* at 27.)

At their July 10, 2014 meeting, they discussed two clients whose parents were planning to relocate from the facility at which Doe worked. (*Id.*; Doe Depo., Doc. 21-4 at 86-87.) Doe asked to work with the clients even after they moved away, but Deutschle withheld permission to do so, after which, according to Deutschle, Doe "became emotional," prompting Deutschle to "point[] out that this was an intense response to [the] issue." (Doc. 32-1 at 27.) At some point during the meeting, Deutschle asked whether Doe's emotions were symptoms of bipolar. (Doe Depo., Doc. 21-4 at 87.) Doe maintained that, although she felt strongly that DYF should not end its professional relationship with the clients, she never raised her voice or acted agitated, and that her behavior was due to professional conviction and her commitment to client service, not a mood imbalance. (*Id.* at 86-87.) At the meeting, Doe also reiterated her sense that any symptoms she might seem to be suffering were merely physical, and that they had even improved. (Doc.

3

32-1 at 27.) Deutschle eventually relented, allowing Doe to continue to work with at least one of the clients. (Doe Depo., Doc. 21-4 at 87.)  As with the meeting one week prior, notes from this meeting indicate that Plaintiff's productivity had remained "good." (Doc. 32-1 at 27.)

On Sunday, July 20, 2014, while in State College, Pennsylvania for personal reasons, Plaintiff awoke with shooting pains causing her to seek urgent medical care. (Doe Depo., Doc. 21-4 at 131-32.) Doe was diagnosed with shingles, a viral infection caused by the chickenpox virus, varicella zoster. Shingles (Herpes Zoster), the Centers the Disease Control and Prevention, *available at https://www.cdc.gov/shingles/* (last seen Oct. 4, 2016). While at urgent care, Plaintiff was administered and prescribed Prednisone, a steroid used to treat several ailments. (Doe Depo., Doc. 21-4 at 132-33.) Prednisone, U.S. Nat'l Library of Medicine, *available at http://medlineplust.gov/druginfo/meds/a601102.html* (last seen Oct. 4, 2016). Upon returning to Ohio, Plaintiff saw her general practitioner for continued care. (*Id.* at 133-34.) She remained on Prednisone until the beginning of August 2014. (*Id.* at 156.)

Doe called Deutschle to report her condition, requesting time off from July 20, 2014 until she recovered. (*Id.* at 95-96, 128-29.) Deutschle told Doe to contact Human Resources Manager Betty Seal and to furnish a doctor's note, which she did. (*Id.* at 128.) DYF's paid leave covered Doe's time off. (*Id.* at 129-30.)

Doe was on medical leave recovering from shingles through Thursday, July 24, 2014. (*Id.* at 137.) Plaintiff felt well enough to return to work the next day, so she did, but later in the day something felt wrong, as though she was "going too fast." (*Id.* at 138; Am. Compl., Doc. 5, ¶¶ 17-18.) Concerned her feelings signaled nascent hypomania, Doe sought medical care immediately, making an appointment to see her psychiatrist at the first available opening, Thursday, July 31, 2014. (*Id.* at 138; Am. Compl., Doc. 5, ¶¶ 17-18.)

4

In the meantime, Doe was scheduled to attend a two-day, DYF-wide training session that began on Monday, July 28, 2016. (Doe Depo., Doc. 21-4 at 95-96.) Doe told Deutschle about her symptoms, and each morning asked if Deutschle had noticed anything amiss and, if she had, whether Doe should be sent home. (*Id.*) Deutschle did not indicate anything out of the ordinary but promised to monitor Doe's behavior closely. (*Id.*) Before the second day of training, Deutschle told Doe that DYF CEO Duane Casares noticed Doe and another being overly talkative and possibly disruptive. (*Id.* at 96-97.) Deutschle, for her part, did not notice any symptoms that would warrant Doe being sent home. (*Id.* at 96.)

At their July 30, 2014 meeting, Doe told Deutschle she might need to take time off work. (7/30/2014 Individual Supervision, Doc. 32-1 at 32.) Deutschle reiterated her concern that the job was too stressful for Doe, to which Doe responded that she wanted to discuss the matter with her physician before reaching any conclusions. (*Id.*) The notes from that meeting indicate that "[Deutschle] reviewed the health issues in terms of needing to be off due to [Doe's] issues," and "[Deutschle] stated that it was creating some problems with judgment in terms of client care." (*Id.*) In those same notes, Deutschle says that she "is not finding any quality of care issues when talking with [Doe's] clients," and that "[c]lients are being seen at the school by . . . [an]other [DYF] worker at this time." (*Id.*)

On July 31, 2014, Doe saw Physician Assistant ("PA") Tiffani Tobin, who works for Doe's Psychiatrist, Dr. Kevin Lowe. (Doe Depo., Doc. 21-4 at 144.) PA Tobin increased the dosage of one of Doe's medications, and took her off work through July 4, 2014, providing her a note stating as much. (*Id.* at 148-49.) Doe told Deutschle about her need for medical leave, and Deutschle indicated it was not a problem. (*Id.* at 151.) On August 7, 2014, Doe saw Dr. Lowe, and told him about her shingles and her course of treatment. (Lowe Work Release Slip, Ex. 32 to

Doe Depo., *Id.* at 156-57.) Knowing that steroids can trigger hypomanic episodes, Dr. Lowe told Doe that she should not have prescribed Prednisone without first consulting him, and he took her off work for two weeks to manage her hypomania. (*Id.* at 148, 156-57.)

Doe then called Deutschle and told her that her psychiatrist thought she was suffering a steroid-induced hypomanic episode, and that she needed more time off. (*Id.*) During the conversation, Deutschle told Doe that DYF Program Director, John Cervi, came to her after training and asked if Doe were well, saying something to the effect of: "[I]t almost seems like she's manic." (*Id.* at 92.) Deutschle told Doe that she thought she needed to tell him about Doe's bipolar disorder. (*Id.*) And because Doe needed time off from work, Deutschle told Doe that she might need to disclose the matter to Casares. (*Id.* at 184-85.) Doe told Deutschle that she trusted her judgment, and said that it was "okay" to disclose her illness as Deutschle saw fit. (*Id.* at 92)

On August 14, 2014, Doe saw PA Tobin, who cleared her for part-time work beginning August 18, 2014, and full-time work beginning August 25, 2014. (*Id.* at 160-61.) Doe informed Deutschle of the plan. (*Id.* at 161.) DYF allows employees to take medical leave, and Plaintiff's absence was not extraordinary as far as DYF is concerned—it regularly covers for employees who are absent due to illness, injury, vacation, or other short-term reason, and Doe complied fully with DYF leave policy and, while away, her clients were adequately served. (Casares Depo., Doc. 21-5 at 100-01; Seal Depo. 12-13; Am. Compl., Doc. 5, ¶ 23.)

Deutschle disclosed Doe's bipolar disorder to Seal around the third week of July. (Seal Depo., Doc. 32-4 at 14.) Deutschle remembers telling Cervi about Doe's bipolar disorder "[o]nce [she] thought it was affecting her performance." (Deutschle Depo., Doc. 21-7 at 88.) She also contacted Casares at some point, and he told her to schedule a meeting with Doe on her first day back from leave, indicating that he wanted Doe to resign. (*Id.* at 92 ("He wanted me to meet with

[Doe] the first day she came back and to review all the issues with her. And then he said see if she feels this is not a good fit for her and if she would like to leave her position.").) If Doe refused to resign, Casares, who was the only person with authority to terminate a DYF employee, would fire her. (Casares Depo., Doc. 21-5 at 66; Cervi Depo., Doc. 32-5 at 17-18.) During their meeting, Casares asked Deutschle if there were any problems with Doe's work, and Deutschle said that nothing came to mind immediately, but that she would review Doe's file. (Doe Depo., Doc. 24-1 at 92-93.) Casares also asked Deutschle to call Doe's clients to see if they had any complaints. (*Id.* at 93.) Deutschle did, and clients said that they "really liked" Doe. (*Id.* at 92-93.)

Plaintiff returned to work as scheduled, on August 18, 2014, and she met with Deutschle that morning. (*Id.* at 91-92.) During the meeting, Deutschle told Doe that she told Casares and Cervi about her bipolar disorder. (*Id.* at 92, 190.) Deutschle then told Doe that she had reviewed her employee file, and discussed the derogatory entries therein.

First, Deutschle noted that Doe had been counseled for failing to maintain professional boundaries with clients. (*Id.* at 173-74.) Specifically, on May 1, 2014, Doe transported unattended a client known to have previously acted out in a sexually suggestive and violent manner, including simulating a sex act with a desk, exposing his underwear, and directing violence at his younger siblings. (*Id.* at 112.) The client approached Doe one day and asked to have a session at the gym instead of their usual on-site location. (*Id.* at 114-15.) Although Deutschle had previously told Doe not to transport the client by herself, Doe forgot the instruction. (*Id.*) Doe later told Deutschle about the session, and Deutschle counseled her not to transport the client alone again. (*Id.*) Doe was not formally disciplined for the incident, but Deutschle did include in her notes a notation of verbal reprimand "for taking unnecessary risk

with a high risk client." (*Id.* at 115; Ex. E, Doc. 32-1 at 20.) At the time of the incident, Doe was on new-hire probation, from which she was removed thereafter. (Ex. E, Doc. 32-1 at 20.)

Next, Deutschle discussed Doe's intense reaction to learning that some of her clients would be moving and no longer seeing Doe professionally. Doe maintained that her response to the news was appropriate. (Doe Depo., Doc. 24-1 at 174.)

Finally, Deutschle discussed an incident in which Doe, while on medical leave, arranged for a client to pick up a prescription slip for a psychotropic drug at DYF instead of at Southeast Healthcare Services ("Southeast"), the client's former social services agency. (*Id.* at 175-77.) Southeast had called Doe to say that the client had transportation issues and could not retrieve the slip there, so Doe had the slip mailed to DYF instead. (*Id.* at 175-76.) Doe called her colleague, Chelsea Clay, and asked her to deliver the slip to the client's caregiver, and Clay agreed. (*Id.* at 168.) Clay later called Doe to say that the slip had not arrived. (*Id.*) Concerned, Doe contacted Deutschle, who told Doe she needed to have Southeast manage the situation. (*Id.* at 169-70.)

After discussing Doe's disciplinary history, Deutschle pressed Doe to resign, saying that she would write her a letter of recommendation if she did. (*Id.* at 179-80.) According to notes taken by Deutschle, Doe agreed with her, but then "asked that she take a break for 1 hour to think it over and she would return at 1 pm." (Ex. E, Doc. 32-1 at 36.) Doe, for her part, felt vulnerable, and pressured. (Doe Depo., Doc. 24-1 at 179.) She left DYF and did not return that day, telling Deutschle that they would speak the next morning. (*Id.* at 180; Deutschle Depo., Doc. 21-7 at 97.) Doe reported to work the next day, August 19, 2014. (Doe Depo., Doc. 24-1 at 182.) She and Deutschle again discussed Doe's employee file, and Doe, "wanting to understand the situation better," asked to speak with Casares and Cervi. (*Id.* at 182-83.) She knew that the

two would be involved with her resignation or termination, and she wanted to discuss "any possible accommodations" that would allow her to keep her job. (*Id.* at 189-90.)

Deutschle emailed Casares on Thursday, August 21, 2014, telling him what she and Doe had recently discussed, namely: Doe's boundary issues, including the transport of the client unattended; Doe's reaction to the transfer of her clients, which Deutschle characterized as "out of proportion" to the topic at-hand; and Doe's having a client's prescription slip mailed to DYF. (Ex. E, Doc 32-1 at 2.) The email also relayed that Doe asked for Casares's "perspective and accommodations." (*Id.*)

Doe met with Casares on August 20 or 21, 2014.[1] (Doe Depo., Doc. 24-1 at 189.) Seal was also in attendance. (*Id.* at 190.) Doe went into the meeting with notes about her performance issues, and she began to discuss them but was soon cut off by Casares, who said that her performance was "not really the issue," and noted that, minus mailing the prescription slip to DYF,[2] she had made merely "rookie mistakes" or "beginner errors." (*Id.* at 190-92.) At some point during the meeting, Doe told Casares that she had consulted an employment attorney versed in the ADA. Paraphrasing Casares, Doe testified that he responded, "[L]et's be human here. I know all about the ADA and everything[,] . . . [but] [d]ue to the unpredictable and sporadic nature . . . of your mental illness[,] . . . we can't have you working with this population," and he said that DYF "can't have [her] walking in and out of these clients' lives."

---

[1] Doe is unsure of the exact date of the meeting. (Doe Depo., Doc. 24-1 at 189.)

[2] Although he alleges that Doe's mailing the prescription slip was a violation of DYF's standards, Casares was unable in deposition to point to any specific policy regarding mailing prescription slips:
Q: Okay. Is there a specific policy with regard to [mailing prescription slips]?
A: I do not know.
Q: Are employees given training in that?
A: I do not know.
(Casares Depo., Doc. 21-5 at 48.)

(*Id.* at 192.) Doe informed Casares that her bipolar disorder was "usually well controlled," and that her most recent hypomanic episode was a fluke due solely to her taking a steroid improperly prescribed. (Doe. Aff., Doc. 33-1, ¶ 7.) Casares then told Doe that he was on the social worker licensure board and that, in his experience, persons with bipolar invariably make mistakes requiring sanction. (Doe Depo., Doc. 24-1 at 195 ("I've seen this happen before[.] [S]ooner or later you're going to make some mistakes and we're going to have to report them to the licensure board. This isn't going to end well.").) Doe took that to mean he would abuse his power to threaten her professional reputation. (*Id.* at 195-96.)

Doe asked Casares if she could keep her current position. He said no. (*Id.* at 197.) She then asked to fill some other position at DYF, suggesting one that entailed only assessment, because she "had spent years doing in [sic] OSU job mood lab where [she] just did assessments all day." (*Id.* at 198.) Casares said there was no position available. (*Id.*) She suggested even more jobs that she could perform and, even though there were open positions that Plaintiff could have filled, Casares told her that there were no openings. (*Id.*) Doe recalls telling Casares something along the lines of: "I really feel like you're not working with me. I want to keep my job, I really like this agency, I like the mission of this agency, the work, it's important to me. I don't want to go[,] . . . but I don't feel like you're giving me any options." (*Id.* at 200-01.) Doe also told Casares that she could not resign due to monetary and health concerns: she was planning a wedding and she needed continuous health insurance to help manage her illness. (*Id.* at 198.) Given those pressing needs, she asked about getting a severance package, which Casares refused before ending the meeting shortly thereafter. (*Id.* at 201-02.)

After the meeting, Casares and Seal discussed possible accommodations for Doe. (Seal Depo., Doc. 32-4 at 40.) They returned with an offer of two weeks of severance, which she

declined. (*Id.*) They then offered her a position as a file clerk, which she also declined. (Doe Depo., Doc. 24-1 at 210-12.) Doe was earning an annual salary of $38,000 at the time, whereas the file-clerk position offered $10.14 for each of its 30 weekly hours, amounting to an annual pay cut of more than $22,000. (Seal Depo., Doc. 32-4 at 43-44.) Further, the position required only a high school diploma or equivalent, and it would not have given Doe supervision credits towards her becoming a licensed independent social worker, which was a prerequisite for obtaining her PhD. (Doe Decl., Doc. 33-1, ¶ 8.)

By the end of that meeting, Doe was left with no work duties: all of her clients had been reassigned, and she was forbidden from contacting them or even speaking with Deutschle. (Doe Depo., Doc. 24-1 at 214-15.) Not wanting to resign, Doe nonetheless continued reporting to work. (*Id.* at 217-18.) She was terminated soon after. (Seal Depo., Doc. 32-4 at 46-47.)

### B. Procedural History

Plaintiff initiated this lawsuit in the Franklin County Court of Common Pleas, (Case No. 15CV-06-4683), alleging that Defendant violated Ohio Revised Code § 4112.99, the Ohio Laws Against Discrimination. (Notice of Removal, Doc. 1.) Defendant removed the matter to this Court on September 28, 2015. (*Id.*) Plaintiff filed her Amended Complaint on September 28, 2015, adding her claim that Defendant violated 42 U.S.C. § 12101, *et seq.*, the Americans with Disabilities Act ("ADA" or "the Act"). (Doc. 5, ¶ 61.) Plaintiff seeks declaratory relief finding Defendant in violation of the ADA and the Ohio Laws Against Discrimination; money damages amounting to more than $25,000; and punitive damages amounting to more than $25,000, among other requests. (*Id.*, pt. VI.)

11

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The court reviewing a summary judgment motion need not search the record in an effort to establish the lack of genuinely disputed material facts. *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). Rather, the burden is on the nonmoving party to present affirmative evidence to defeat a properly supported motion, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), and to designate specific facts that are in dispute. *Anderson*, 477 U.S. at 250 (citation omitted); *Guarino*, 980 F.2d at 405.

To survive the motion, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). As such, the mere existence of a scintilla of evidence in support of the opposing party's position is insufficient to survive the

motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson*, 477 U.S. at 251 (citation omitted); *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995).

### III. ANALYSIS

### A. Plaintiff's Request for Judicial Admission

The Court first addresses Doe's request for a judicial admission. Paragraph 53 of Doe's Amended Complaint avers that "Defendant offered Plaintiff a position as a file clerk for 30 hours a week earning $10.14 per hour *and without health insurance benefits*." (Doc. 5, ¶ 53 (emphasis added).) Defendant's Answer admitted as much. (Answer to Am. Compl., Doc. 7, ¶ 53.) Doe now asks the Court to find judicially admitted the fact that the file-clerk position offered to Plaintiff did not include health insurance benefits.

Whether to find a fact judicially admitted is a determination that lies within the sound discretion of the Court. *MacDonald v. Gen. Motors Corp.*, 110 F.3d 337, 340 (6th Cir. 1997). A deliberate, unequivocal and voluntary waiver, such as Defendant's here, usually results in a court finding that the admitted fact is true. *Id.* Indeed, policy supports such a finding. *Id.* But, "considerations of fairness . . . require that trial judges be given broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases." *Id.* (alterations in original) (quoting *United States v. Belculfine*, 527 F.2d 941, 944 (1st Cir. 1975)).

This is such an appropriate case, because the admission is based on a falsehood. Doe acknowledged receiving an August 22, 2014 email from Seal confirming that her health insurance would not be discontinued if she took the file-clerk position. (Seal Email to Doe, Doc. 21-2). Although the Court might have resolved this issue differently if there were *any* controversy as to the truth of the fact, there is no such controversy here and, to be sure, "[t]he

13

purpose of pleading is to facilitate a proper decision on the merits," *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (*abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), not to reward parties capitalizing on "gotcha" scenarios. The Court **DENIES** Plaintiff's request for a judicial admission, and now turns to Plaintiff's main claims.

### B. Plaintiff's Americans with Disabilities Act Claims

Preliminarily, Plaintiff's Americans with Disabilities Act claim subsumes her state-law claim. *See Jakubowski v. The Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010).

The ADA forbids employers from discriminating against disabled employees, providing, in relevant part, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . [the] discharge of employees, employee compensation . . . [or] other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Act defines "discriminat[ing] against a qualified individual on the basis of a disability" to include, among other choices:

> (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee; . . .
>
> (3) utilizing standards, criteria, or methods of administration—
> (A) that have the effect of discrimination on the basis of disability; or
> (B) that perpetuate the discrimination of others who are subject to common administrative control; . . .
>
> (5)
> (A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or
> (B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant.

42 U.S.C. § 2112(a)(1), (3), (5)(A)-(B).

To prevail in an ADA claim, a plaintiff must show that: (1) she is an individual with a disability or was regarded as such; (2) she is "otherwise qualified" to perform the job's duties, with or without reasonable accommodation; and (3) she suffered an adverse employment action "because of" her disability or was denied a reasonable accommodation. 42 U.S.C. § 12102(1)(C); *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc); *Lewis*, 681 F.3d at 321 ("The . . . ADA bar[s] discrimination 'because of' an employee's age or disability, meaning that [it] prohibit[s] discrimination that is a '"but-for" cause of the employer's adverse decision.'") (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

A plaintiff may establish an ADA violation by introducing direct and/or indirect evidence. Direct evidence is evidence which, if believed, requires a fact finder to conclude "that unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (quoting *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir. 2005)). Indirect evidence requires a fact finder to make an inference to so conclude. *Amini*, 440 F.3d at 359.

To prevail on an ADA claim premised on direct evidence, a plaintiff bears the burden of proving by a preponderance of the evidence that: (1) she was disabled or regarded as such; and (2) she was "otherwise qualified" for the position despite her disability either with an essential job requirement eliminated or with or without a proposed reasonable accommodation. 42 U.S.C. § 12102(1)(C); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (quoting *Hedrick v. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004) (citing *Monette*, 90 F.3d at 1186)). The

15

employer then bears the burden to respond "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship." *Kleiber*, 485 F.3d at 869 (citations omitted).

To prevail on an ADA claim premised on indirect evidence, the Court applies to the facts the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3] *Id.* Under that framework, a plaintiff must first make a prima facie showing of discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). Next, the employer may rebut the prima facie showing by articulating "'some legitimate, nondiscriminatory reason' for taking the challenged action." *Id.* (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000)). Finally, if the defendant successfully rebuts the plaintiff's prima facie showing, the plaintiff "must then 'prove that the proffered reason was actually a pretext to hide unlawful discrimination.'" *Id.* (quoting *Johnson*, 215 F.3d at 573). To establish pretext, the plaintiff need only rebut, not disprove, the proffered reason. *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation marks and citation omitted). A plaintiff may establish pretext by showing that the proffered nondiscriminatory reason had no basis in fact, was insufficient to motivate the adverse action, or did not actually motivate the action. *Harris v. Metro. Gov't of Nasvhille & Davidson Cnty., Tenn.*, 594 F.3d 476, 486 (6th Cir. 2010).

---

[3] Relying on discrimination cases arising under Title VII from the Ninth Circuit, Plaintiff contends that the Court may jettison the *McDonnell Douglas* framework if she so chooses. *See, e.g., Costa v. Desert Palace, Inc.*, 299 F.3d 838, 855 (9th Cir. 2002) ("[N]othing compels the parties to invoke the *McDonnell Douglas* presumption.") (citing *United States Postal Serv. Bd. v. Aikens*, 460 U.S. 711, 717 (1983)). Given clear direction from the Sixth Circuit to use the *McDonnell Douglas* framework for discrimination claims premised on indirect evidence, *see Johnson*, 319 F.3d at 865-66, the Court is not persuaded by Plaintiff's argument and will not follow her suggestion; the Court will note, however, that the utility of a tripartite procedural schema to resolve such a simple and obvious question, *see Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009) (noting that "it is important to avoid formalism in its application, lest one lose the forest for the trees. Pretext is a *commonsense* inquiry: did the employer fire the employee for the stated reason or not?") (emphasis added), has proven questionable. *See, e.g., Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009) (collecting cases).

Although she does not spell out which portion of the ADA is operative here, the pleadings and briefing evince two separate claims: one based on Defendant's alleged misperception that Plaintiff's illness prevented her from competently performing her job duties (the "regarded-as claim"); and the other based on Defendant's alleged failure to engage with Plaintiff in an interactive process seeking a reasonable accommodation for her disability (the "accommodation claim"). The Court addresses the claims in turn.

### 1. Regarded-as Claim

The ADA protects employees "who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Ferrari v. Ford Motor Co.*, 826 F.3d 885 (6th Cir. 2016) (citations omitted). Employees are regarded as disabled "when '(1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities.'" *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (alterations in original) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)). According to the Code of Federal Regulations, "major life activities" include, among others, "[c]oncentrating, thinking, communicating, interacting with others, and working." 29 C.F.R. § 1630.2(i).

It is undisputed that bipolar disorder is an impairment encompassed by the Act, and that the CEO was aware of Plaintiff's bipolar when he terminated her. In dispute is whether misperceptions of Plaintiff's bipolar caused him to do so. Also in dispute is whether Plaintiff has premised her claim on direct evidence of discrimination. Because resolving the latter dispute directs the Court's analysis, the Court's analysis starts there.

*a. Direct Evidence*

At their August 2014 meeting, the CEO told Plaintiff something to the effect of: "[L]et's be human here. I know all about the ADA and everything[,] . . . [but] [d]ue to the unpredictable and sporadic nature . . . of your mental illness[,] . . . we can't have you working with this population," and that DYF "can't have [her] walking in and out of these clients' lives." (Doe Depo., Doc. 21-4 at 192.) Defendant argues that this is not direct evidence of discrimination because Casares did not explicitly mention her bipolar disorder.[4] The Court disagrees.

Defendant's understanding of what "inference" means re discrimination claims is too narrow. Direct evidence is not necessarily evidence that is entirely self-evident, which is to say that there are some premises that need not be established by the evidence upon which the claim rests. For example, according to Defendant's understanding, an employer telling a black employee that she was being terminated because of her race would not be direct evidence of discrimination because the employer did not mention the employee's race, which means a fact finder would have to deduce discriminatory intent by establishing the employee's race from evidence outside the employer's statement. That cannot be the case. Here, an employer told an

---

[4] "Plaintiff alleges that Mr. Casares attributed Plaintiff's performance issues to her disability, but when asked if Mr. Casares specifically mentioned Plaintiff's bipolar disorder, Plaintiff was unable to respond in the affirmative. Instead, Plaintiff testified as to what she interpreted Mr. Casares' statements to mean. Plaintiff testified:

> A. No. That's not what he was saying. He is saying we're going to catch you in mistakes and report you.
> Q. In response to your bipolar disorder?
> A. No. He was just saying that it's inevitable, you're going to make a mistake because of – I think he was saying because of your bipolar disorder.
> Q. But he didn't actually say that?
> A. He did not say those exact words.

(Plaintiff's Depo. pp. 195-198).
Plaintiff's evidence of casual conversations with Ms. Deutschle about Plaintiff's bipolar disorder and Plaintiff's own interpretation of Mr. Casares' statements does not rise to the level of evidence necessary to establish disability discrimination by direct evidence."
(Doc. 20 at 13.)

employee with bipolar that she was being terminated because of her mental illness. Terminating an employee who is believed to have bipolar disorder (and no other mental illness) because of her mental illness is *necessarily* terminating that employee because she has bipolar. This is direct evidence supporting Plaintiff's claim. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) ("In discrimination cases, direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions) (citations omitted).

Having found direct evidence of discriminatory intent, the Court now turns to whether Plaintiff was "otherwise qualified" for the position despite her disability either with an essential job requirement eliminated or with or without a proposed reasonable accommodation. *Kleiber*, 485 F.3d at 869 (quoting *Hedrick*, 355 at 452 (6th Cir. 2004) (citing *Monette*, 90 F.3d at 1186)).

Defendant argues that Plaintiff's failure to dispute that "she admitted to both her supervisor and Mr. Casares that she was not a good fit for the job" is an admission that she was not qualified for the job. (Doc. 35 at 5.) Relying on Plaintiff's deposition testimony, Defendant contends that she was unqualified for the position. A cursory glance at the testimony cited, and a brief consideration of the record, demonstrates otherwise.

As to Plaintiff's testimony, although at one point during the August 18, 2016 meeting with Deutschle, she "start[ed] to say some things like, well, maybe something else might be a better fit," (Doe Depo., Doc. 24-1 at 180), Plaintiff testified repeatedly and unequivocally, and that she never said she was unqualified for the job. (*Id.* at 179-80). Further, Plaintiff was feeling "caught off guard," "vulnerable," and "pressured" at that meeting. (*Id.* at 180.) Deutschle's behavior caused Plaintiff to feel "very coerced." (*Id.*) This is no admission textually or contextually. As to language, it is not an irresistible conclusion that Plaintiff admitted she was

unqualified for the job because she believed another job might have been a better fit. Rhetoric aside, Defendant asks the Court to find that a possibly coerced statement is a dispositive admission. The Court will not do so.

Looking elsewhere, there is enough probative evidence to submit to a jury to decide whether Plaintiff was qualified for her job, including several notations in her employee file that her productivity was "good," her removal from new hire probation even after taking an "unnecessary risk" with a troubled youth, and the fact that mailing the prescription slip to DYF, allegedly her gravest error, was not in violation of any specific DYF rule, code, or directive. Further, all of Plaintiff's work was covered while she was on medical leave for her unexpected hypomanic episode, and there were no client care issues noted. Indeed, clients praised Plaintiff's work consistently and unanimously. In sum, a reasonable fact finder could conclude that Plaintiff was qualified for the position and could perform her duties sufficiently and competently.

Defendant now bears the burden to respond, "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship." *Kleiber*, 485 F.3d at 869 (citations omitted). Defendant has done neither. As such, the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's regarded-as claim. Assuming, *arguendo*, that the CEO's admission that he terminated Plaintiff because of her bipolar disorder was not direct evidence of discrimination, the Court, out an abundance of caution, also conducts the following *McDonnell Douglas* analysis.

### b. *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* framework for discrimination claims premised on indirect evidence:

> the plaintiff faces the initial burden of presenting a prima facie case of unlawful discrimination. [*Johnson v. Univ. of Cincinnati*, 215 F.3d at 572]. The

establishment of a prima facie case creates a rebuttable presumption of
discrimination and requires the defendant to "articulate some legitimate,
nondiscriminatory reason" for taking the challenged action. *Id.* at 573 (internal
quotation marks omitted). If the defendant is able to satisfy this burden, the
plaintiff must then "prove that the proffered reason was actually a pretext to hide
unlawful discrimination." *Id.*

*Johnson*, 319 F.3d at 865-66.

### i. Plaintiff Has Made Her Prima Facie Showing

Termination is an adverse employment action. *White v. Baxter Healthcare Corp.*, 533

F.3d 381, 402 (6th Cir. 2008). As is a "reassignment with significantly different responsibilities,

or a decision causing a significant change in benefits." *Id.* (quoting *Burlington Indus., Inc. v.*

*Ellerth*, 524 U.S. 742, 761 (1998)). In question here is whether Plaintiff's bipolar was a "but-for"

cause of Defendant taking the adverse action. *Lewis*, 681 F.3d at 321.

Plaintiff testified that the CEO told her that "[d]ue to the unpredictable and sporadic

nature" of her mental illness, she could not work at DYF. (Doe Depo., Doc. 21-4 at 192.) There

is no meaningful difference between the phrases "due to" and "because of," "by reason of," "on

account of," or "based on." *See Gross*, 557 U.S. 167, 176-77 (2009). Defendant's terminating

Plaintiff "due to" her bipolar establishes that Plaintiff's bipolar was a but-for cause of the

adverse employment action. *See id.* Plaintiff has made her prima facie showing.

### ii. Defendant Has a "Legitimate, Nondiscriminatory Reason" for Taking Its Action

Defendant submits that Plaintiff was terminated for the reasons discussed in-depth above,

to wit: transporting a high-risk client unattended; exhibiting "a pattern of exercising poor

judgment due to her difficulty establishing and enforcing professional boundaries"; and having

the prescription slip mailed to DYF for a client to pick up. (Doc. 20 at 16-17.) Expectedly,

violations of workplace policy or standards have been found to be a legitimate, non-

discriminatory reason for termination. *See Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042,

1044 (6th Cir. 1998). In deposition, Plaintiff agreed that these incidents occurred and that she

was counseled for them. (Doe Depo., Doc. 24-1 at 174-80.) The CEO testified that the incidents

collectively demonstrated that Plaintiff was unfit for the job. (Casares Depo., Doc. 21-5 at 43,

65.) On this point there are also Deutschle's testimony, and contemporaneous documentation

corroborating Defendant's contention. There is enough record evidence to find reasonably that

Defendant had a legitimate, non-discriminatory reason to terminate Plaintiff.

  iii. <u>Defendant's Proffered Reason Could Reasonably Be Found to Be Pretextual</u>

  Pretext may be inferred from "weaknesses, implausibilities, inconsistencies,

incoherencies, or contradictions" in an employer's proffered reasons. *Morgan v. Hilti, Inc.*, 108

F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Aerospace*, 101 F.3d 947, 951-52

(3rd Cir. 1996)). The ultimate question is: "did the employer fire the employee for the stated

reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). At summary

judgment, the question is simply "whether the plaintiff has produced evidence from which a jury

could reasonably doubt the employer's explanation." *Id.*

  Plaintiff has set forth enough evidence to doubt Defendant's proffered reason, including

the fact that Deutschle consistently rated Plaintiff's productivity as good, never noticed any

client care issues, and, when prompted, could not think of one problem with Plaintiff's job

performance. Further, the CEO's testimony that Plaintiff's "pattern of questionable judgment"

was the reason he terminated Plaintiff is belied by the fact that she was removed from probation

even after transporting the high-risk client, and by his admission that he knew of no policy

prohibiting mailing the prescription slip to DYF.

  The Court finds enough evidence upon which a fact finder could reasonably infer pretext.

A juror could rightly find it suspect that the CEO refused to discuss Plaintiff's job performance

at their final meeting, saying it was "not really the issue." What was the issue, if not her job performance? A juror could rightly find it suspect that the CEO described Plaintiff's errors as "rookie mistakes" yet still wanted her fired. Why terminate an average employee? And a juror could rightly find it suspect that, even though he knew she had suffered only one, aberrant, mood episode, the CEO offered his prediction as to the severity and course of Plaintiff's bipolar disorder. On what did he base his opinion?

In sum, a juror could reasonably find that Casares's estimation of Plaintiff's unfitness for the job was really because of his preconceptions of Plaintiff's bipolar, which could result from prejudices and stereotypes about the mentally ill, which would violate the ADA. *Gruener*, 510 F.3d at 664. The Court **DENIES** Defendant's motion as to Plaintiff's regarded-as claim.

## 2. Accommodation Claim

To prevail in her accommodation claim, Plaintiff must show that she requested a reasonable accommodation. *Kleiber*, 485 F.3d at 870. The ADA requires both parties then to negotiate in good faith in an "interactive process" to determine the request's adequacy and feasibility. *Id.* The Sixth Circuit has established that "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination." *Id.* at 868 (citing *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir. 1996)). As such, the Court applies the three-pronged direct-evidence test to the facts of this case. *Monette*, 90 F.3d at 1186; *Kleiber*, 485 F.3d at 869.

Under that test, Plaintiff bears the burden of proving by a preponderance of the evidence that: (1) she was disabled or regarded as such; and (2) she was "otherwise qualified" for the position despite her disability either with an essential job requirement eliminated or with or without a proposed reasonable accommodation. 42 U.S.C. § 12102(1)(C); *Kleiber v. Honda of*

23

*Am. Mfg., Inc.*, 485 F.3d 862, 869 (quoting *Hedrick v. Reserve Care Sys.*, 355 F.3d 444, 452 (6th Cir. 2004) (citing *Monette*, 90 F.3d at 1186)). Defendant must then respond, "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship." *Kleiber*, 485 F.3d at 869 (citations omitted).

Defendant submits that, although she requested time off work, (Doe Depo., Doc. 24-1 at 28-29, 85, 121, 1543, 157-58), "Plaintiff did not request a reasonable accommodation," and that she "refused to participate in any meaningful discussion . . . regarding the implementation of a reasonable accommodation." (Doc. 20 at 18.)

Plaintiff contends that she sought "to be reasonably accommodated by a monitoring/leave/treatment approach that seemed to be working before the malpractice of a steroid shot for shingles contraindicated for individuals taking bipolar medication." (Doc. 34 at 28.) And at the termination meeting with the CEO, Plaintiff specifically requested to work in an available position commensurate with her skills and experience, but the CEO was willing to discuss only the part-time file-clerk position that offered Plaintiff substantially less compensation and no potential for career growth. (Doe Depo., Doc. 24-1 at 197-98.)

The Court finds that there is enough evidence to submit to a jury to decide whether Plaintiff requested a reasonable accommodation. Plaintiff's request to move to another position is by itself a recognized request for accommodation. *See Kleiber*, 485 F.3d at 870. And "[w]here the requested accommodation is a job transfer, 'employers have a duty to locate suitable positions for' employees with disabilities." *Id.* (quoting *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 258 (6th Cir. 2000)). Plaintiff alleges that she requested to be moved to one of several positions commensurate with her experience, and that Defendant said there were no such positions open when, in fact, there were. (Doe Depo., Doc. 24-1 at 198.) Plaintiff also alleges

24

that she felt like the CEO was being intransigent in refusing even to consider her request. (*Id.* at 200-01.) Drawing all inferences in the non-movant Plaintiff's favor, it appears from the record that Defendant failed to perform its duty. Indeed, as set forth in *Melange v. City of Center Line*, 443 F. App'x 81, 84-85, "[o]nce the employee requests an accommodation, the employer has a *duty* to engage in an 'interactive process' to 'identify the *precise* limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.'" *Id.* (emphases added) (quoting *Kleiber*, 485 F.3d at 871).

A juror could reasonably find that Defendant offering Plaintiff, take-it-or-leave-it, a position that was far beneath her skills, experience, and education, and that came with a precipitous decrease in income, did not constitute good-faith engagement in the interactive process as required under the Act.

Because it contends that Plaintiff never requested an accommodation, Defendant has, understandably, made no argument as to any proposed accommodation's unreasonableness or inconvenience. As such, Defendant has not met its burden, and the Court **DENIES** Defendant's Motion for Summary Judgment as to Plaintiff's accommodation claim.

## IV. CONCLUSION

For the aforementioned reasons, the Court **DENIES** Defendant's Motion for Summary Judgment.

**IT IS SO ORDERED**.

s/Algenon L. Marbley
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATE: October 19, 2016**